IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGEL AVILES, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | NO. 08-CV-02440 |
|     Defendant. | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TIMOTHY R. RICE**                                                                                    **August 17, 2012**
**U.S. MAGISTRATE JUDGE**

      Resolution of this Federal Tort Claims Act ("FTCA") action turns on whether the Government breached the statutory duty of care it owes Angel Aviles, a federal prisoner who suffered from painful hernias during his first five years in Bureau of Prisons ("BOP") custody. The trial featured divergent accounts of Aviles' symptoms, his efforts to seek medical attention, his physical activities while in custody, and the interpretation of prison policies and procedures regarding inmate medical care. It is undisputed, however, that doctors examined Aviles at the behest of prison medical staff and recommended surgical repair of his hernias in April 2005, October 2008, and January 2010. Despite those recommendations, and despite a series of medical and administrative requests by Aviles that surgery be scheduled, the recommended surgery did not occur until April 2010. The procedure was successful.[1]

---

[1] Two hernias were repaired. Aviles developed a third hernia before the surgery, and he now claims the Government is obligated to repair it as well. He agrees, however, that all pain caused by his original two hernias ceased following the 2010 surgery.

As set forth more fully below, I find the Government breached its duty of care by failing to provide Aviles with adequate, reasonable, and timely medical care for his hernias between January 2007, when Aviles was transferred to his designated BOP institution where he could receive stable post-operative care, and April 2010, when Aviles' surgery was finally performed.  I further find Aviles endured physical pain and embarrassment as a result of the Government's actions, and that he is entitled to $32,500 in damages.

I.      Findings of Fact

1. Aviles has been in federal custody since January 2005.  He initially was housed at the Federal Detention Center ("FDC") in Philadelphia, then moved to the Federal Correctional Institution in Schuylkill County, Pennsylvania ("FCI-Schuylkill"), in January 2007.  See Feb. 27, 2012 Tr. Bench Trial at 26, 107-08, Aviles v. United States, No. 08-2440 (E.D. Pa. Feb. 27, 2012) [hereinafter Day 1 Tr.].

2. Dr. Stephen Hoey, the medical officer at the FDC, testified about prison medical procedures and information contained in Aviles' medical file.  See Feb. 28, 2012 Tr. Bench Trial at 4-93, Aviles v. United States, No. 08-2440 (E.D. Pa. Feb. 28, 2012) [hereinafter Day 2 Tr.].

3. If an inmate is sent for a surgical consultation and returns with a report in which the consulting doctor recommends surgery, BOP medical staff should promptly review the report.  If surgery is not scheduled, the staff should document why the recommendation is not followed.  Id. at 9-10, 67-69.

4. Pursuant to BOP policy, non-urgent (or "elective") procedures -- or those that are "medically acceptable" but "not always necessary" -- require review and approval by the Utilization

Review Committee ("URC").  Def.'s Trial Ex. 6 at 270-71.  After conducting its review, the URC must decide whether to approve, deny, or refer the matter for further evaluation, and its decision must be conveyed to the inmate in writing and included in the inmate's medical file.  Id. at 272.

5.  Because the FDC is a temporary housing facility with frequent inmate transfers and staff variability, it is not an ideal setting for stable rehabilitation after surgery.  Day 2 Tr. at 10.

6.  According to Dr. Hoey, there is no deadline within which the BOP must act on a recommendation for an elective procedure.  Id.

7.  When he was arrested, Aviles had a hernia, from which he had suffered for many years.  Day 1 Tr. at 26-27, 76.

8.  Aviles had complained of pain from his hernia, had been evaluated by medical staff, and had received over-the-counter pain medication during previous terms of incarceration in state facilities.  See id. at 76-82.

9.  By 2002, Aviles had learned how to reduce his hernia, i.e., to push on the bulge and make it -- and the accompanying pain -- subside.  Id. at 80-82.

10.  In 2003 and 2004, Aviles twice visited emergency rooms complaining of hernia pain, and at least one doctor recommended surgery.  Id. at 83-87.  Aviles chose not to schedule surgery during that time, at least partly due to fear.  Id. at 84, 123-25.

11.  Aviles disclosed his hernia to FDC medical personnel during his intake assessment.  Id. at 27, 87-90.

12.  In March 2005, Aviles told an FDC physician's assistant about his hernia, which was reducible at the time, and a surgical consultation was ordered.  Id. at 93-94.

13. Dr. Horowitz examined Aviles in April 2005 and recommended surgery to repair his hernia. Id. at 101; Def.'s Trial Ex. 2 at 105. Aviles signed a consent-to-surgery form. Def.'s Trial Ex. 2 at 106-11.

14. Dr. Horowitz's recommendation was reviewed by Dr. Massa at the FDC the same day it was issued. See id. at 77. Dr. Massa noted the URC would "review case for repair." Id. There is no evidence showing when, or if, such review occurred.

15. In March 2006, Aviles saw Dr. Reynolds at the FDC and complained of hernia pain, which he rated a three or four out of five. Id. at 66.

16. Dr. Reynolds examined Aviles again in September 2006 and advised him he would not receive surgery until he was moved to his designated BOP institution, thereby minimizing the risk of post-surgical infection. Def.'s Trial Ex. 2 at 61; see Day 1 Tr. at 105-06.

17. Although BOP medical staff did not give Aviles ibuprofen for his hernia pain when he requested it, Tylenol was available for purchase at the prison commissary. Day 1 Tr. at 38-39; Def.'s Trial Ex. 2 at 25.

18. After arriving at FCI-Schuylkill, Aviles was examined by Dr. Chaw, told him about the hernia, and said it was painful. Day 1 Tr. at 108. Dr. Chaw placed Aviles on restricted duty, including directives that Aviles receive a bottom bunk and refrain from lifting weights. Def.'s Trial Ex. 2 at 147.

19. Despite Dr. Chaw's restrictions, Aviles was never given a bottom bunk. Day 1 Tr. at 111.

20. Despite the restrictions, Aviles chose to lift weights several times a week from 2007 until early 2009, id. at 112-14, primarily for two reasons: (a) Dr. Chaw recommended he lose weight, id. at 58; and (b) he did not want other inmates to view him as weak when they saw him "bend over and

push [his] hernia in," so he exercised "to play the part so no one would mess with [him]," id. at 127; see also id. at 58.

21. While at FCI-Schuylkill, Aviles overcame his fear of having surgery to repair his hernia because his pain had increased, and because he did not want his condition to prevent him from carrying out a normal routine for the duration of his lengthy sentence. See id. at 124-26.

22. On February 23, 2007, Aviles submitted a request form to the Health Services Administrator ("HSA") at FCI-Schuylkill requesting surgery to repair his hernia, which he said caused "constant pain." Def.'s Trial Ex. 2 at 136. The same day, Aviles visited the prison's Chronic Care Clinic, where Dr. Chaw noted his hernia was reducible. Id. at 54. Aviles did not complain of "constant pain" -- or any other hernia-related symptoms -- during his visit with Dr. Chaw. Id. at 53.

23. Aviles rated his hernia pain as "5/10" in November 2007 and was given a truss to wear for support as needed. Id. at 41-42.

24. He complained of "mild discomfort" from his hernia during a March 25, 2008 sick-call encounter. Id. at 39.

25. Aviles filed administrative documents with his counselor and the warden in May 2008, again requesting surgery and complaining of "constant pain." Def.'s Trial Ex. 5 at 200, 202. His requests -- and his subsequent appeal to a BOP Regional Director -- were denied. Id. at 201, 205-07.

26. In the responses to his administrative complaints, Aviles was instructed to sign up for sick call when he experienced hernia pain. Id. at 201, 205, 207. Aviles was dissatisfied, believing he

should not be expected to use the sick-call process, which required a modest copayment, for a condition that was chronic. Id. at 206; Day 1 Tr. at 118-19.

27. Around the same time, Aviles, acting pro se, filed this lawsuit. See generally Compl., Aviles v. Levi, No. 08-2440 (E.D. Pa. June 3, 2008).

28. On October 30, 2008, Dr. Carlos Villarreal evaluated Aviles' hernia pursuant to a November 8, 2007 consultation request by a doctor at FCI-Schuylkill. Def.'s Trial Ex. 2 at 94; Def.'s Trial Ex. 12 at 5, 27.[2]  There is no evidence explaining why it took nearly a year for the consultation to occur. Dr. Villarreal received no notification of the consultation request before the date of his evaluation. Def.'s Trial Ex. 12 at 6.

29. Dr. Villarreal diagnosed a "large left inguinal/scrotal hernia and an umbilical hernia," and recommended repair of both.[3] Id. at 27. Aviles again consented to surgery. Id.

30. On August 31, 2009, Aviles signed up for sick call, requesting surgery on his hernias which "interfer[ed] with [his] everyday activities." Pl.'s Trial Ex. 18.

31. Aviles was seen in the Chronic Care Clinic on September 14, 2009, complaining of back pain and stating his hernias were "acting up." Def.'s Trial Ex. 2 at 30.

32. On October 26, 2009, Aviles went to sick call and asked when his hernia surgery would be scheduled. Id. at 27. The next day, a physician's assistant ("PA") reviewed Dr. Villarreal's 2008

---

[2] Exhibit 12 is a transcript of Dr. Villarreal's video deposition, which was played during the trial. I will cite to the page numbers printed on the bottom of each page of the exhibit.

[3] An inguinal hernia is located in the groin area, and an umbilical hernia is near the bellybutton. Def.'s Trial Ex. 12 at 6.

recommendation and referred it to the URC. Id. at 26. There is no evidence explaining why it took nearly a year for someone at the prison to review Dr. Villarreal's report.

33. The same PA saw Aviles on December 2, 2009 and informed him he had been approved for surgery. Id. at 23. This visit occurred on the same day the Clerk of this Court docketed a motion by Aviles seeking a temporary restraining order and a preliminary injunction. See Mot. TRO & Prelim. Inj., Aviles v. Levi, No. 08-2440 (E.D. Pa. Dec. 3, 2012).

34. In January 2010, Aviles filed another series of administrative complaints requesting surgery and complaining of "excruciating pain." Def.'s Trial Ex. 5 at 240-42; see id. at 244, 246.

35. Dr. Villarreal examined Aviles again on January 20, 2010. Def.'s Trial Ex. 12 at 35. This time, he diagnosed Aviles with "a small right inguinal hernia," in addition to his "large left scrotal hernia" and "moderate umbilical hernia." Id. Because he believed repairing all three hernias in one surgery would be too aggressive, Dr. Villarreal recommended proceeding only with respect to the two hernias he had observed previously. Id.; see also id. at 8 ("The right inguinal hernia . . . did not need to be repaired at that time."). He stated he would "plan on scheduling the surgery as soon as it is approved." Id. at 37.

36. The PA at FCI-Schuylkill reviewed Dr. Villarreal's second report on February 3, 2010 and noted his recommendation to repair Aviles' hernias "to prevent complications and relieve discomfort."[4] Def.'s Trial Ex. 2 at 21.

---

[4] Dr. Villarreal's report apparently was not shared with the warden, who responded to one of Aviles' administrative complaints on February 5, 2010 and inaccurately referred to a singular "hernia" which had "not changed in size." Def.'s Trial Ex. 5 at 241.

37. Dr. Villarreal repaired Aviles' left inguinal and umbilical hernias on April 1, 2010.  Def.'s Trial Ex. 12 at 39.  There is no evidence explaining why it took two months to schedule the surgery after Aviles' reevaluation (and another two months to schedule the reevaluation after Aviles was notified surgery had been approved).

38. In his surgical report, Dr. Villarreal noted preoperative and postoperative diagnoses of "[l]eft scrotal inguinal hernia and umbilical hernia both incarcerated."  Id.; see also id. at 41 (describing "incarcerated contents" associated with the inguinal hernia).  "Incarcerated" means the hernia no longer can be reduced.  Id. at 8.

39. Aviles is now housed in Beaumont, Texas.  Id. at 63-64.  He claims the right inguinal hernia Dr. Villarreal identified before his surgery is now causing him pain and cannot be reduced.  Id. at 64, 66.  He admitted, however, that he has complained only once to medical personnel in Beaumont about his remaining hernia.  Id. at 64.  There is no evidence any doctor has recommended surgery.

40. Based on their demeanor, the substance of their testimony, and the supporting documents admitted as exhibits, I find both Aviles and Dr. Villarreal credible.[5]

41. Besides his general descriptions of prison medical policy and structure, Dr. Hoey's testimony is entitled to little weight for several reasons.

---

[5] Although it appears Aviles exaggerated his symptoms in his administrative complaints, calling it "constant" and "excruciating," his reports to medical sources and his trial testimony credibly described pain levels and other symptoms that varied day-to-day and increased over the relevant time period.  He also stated it eventually became difficult for him to reduce his hernias, a fact which Dr. Villarreal's surgical report supports.

42. First, Dr. Hoey never met Aviles and was not involved in his care; his knowledge of Aviles' condition and its treatment was based entirely on his review of Aviles' medical file. See, e.g., Day 2 Tr. at 15-16, 40, 60; see also id. at 62 (admitting he did not review all of Aviles' records). He is not a surgeon and did not testify as an expert witness. Id. at 56-57, 90.

43. Second, Dr. Hoey repeatedly stated Aviles rarely complained of pain from his hernia. See, e.g., id. at 16, 25, 29, 33, 77-78, 88; cf. id. at 18 (stating the BOP would "never schedule surgery based solely on a complaint of pain"). His claims, however, disregarded Aviles' consistent requests for surgery to repair his hernia, and his numerous administrative complaints seeking surgery and complaining of pain.[6] See id. at 17, 47; but see id. at 73-74 (agreeing Aviles' complaints of pain in administrative documents submitted to the HSA should have been conveyed to the medical staff).

44. Third, despite Dr. Villarreal's decision to recommend hernia surgery "to prevent complications such as infection," Def.'s Trial Ex. 12 at 35, Dr. Hoey testified a surgeon would not operate "to prevent complications," Day 2 Tr. at 81. Although Dr. Villarreal's surgical report reflected Aviles' hernias were incarcerated by 2010, Def.'s Trial Ex. 12 at 39, 41, Dr. Hoey claimed there was nothing in Aviles' medical records suggesting his hernias were not reducible, Day 2 Tr. at 84. When confronted with the surgical notes, Dr. Hoey implicitly -- and inappropriately -- questioned their accuracy. Id. at 85 ("It means that miraculously, at the time of surgery, it -- they discovered a left

---

[6] The frequency of Aviles' requests to have his hernias repaired lends credence to his testimony that he often experienced hernia pain, even if he sometimes opted not to attend sick call. Besides a desire to avoid further pain, I can conceive of no rational explanation -- and the government has suggested none -- for a man to so actively pursue invasive surgery.

scrotal hernia, an umbilical hernia, both incarcerated."). To the extent Dr. Villarreal's records and testimony contradict Dr. Hoey's statements, I credit Dr. Villarreal.

45. Finally, Dr. Hoey's demeanor while on the stand diminished his credibility, especially during cross-examination. He was argumentative, appeared disdainful toward Aviles and his claims, and often smirked or laughed when responding to Aviles' counsel.

46. Dr. Sean Harbison testified as an expert in general surgery. He performs between 80 and 120 hernia repair surgeries each year. Def.'s Trial Ex. 11 at 4.[7]

47. Dr. Harbison testified hernias that can be reduced can be repaired "at any time" in "completely elective" procedures; hernias that are "irreducible" are "a little more compelling to fix"; hernias that are "incarcerated" are "more severe," cause "more symptoms," and have "a little more urgency"; and hernias that are "strangulated" are "really urgent." Id. at 6. According to Dr. Harbison, Aviles had a "reducible, mildly symptomatic hernia" with "no urgency to repairing it," and "it didn't have to be repaired, at all." Id.

48. Although Dr. Harbison opined the BOP's decision to observe Aviles' hernia without performing urgent repair was "within the standard of care," id. at 7, and "there was [no] und[ue] delay" by BOP medical staff in treating Aviles' hernia, id. at 8, Dr. Harbison's credibility suffers for some of the same reasons as Dr. Hoey's. He never examined Aviles, reaching his conclusions based almost entirely on his review of the prison's medical records. Id. at 5, 29. He did not review Aviles' administrative complaints until presented with them on cross-examination, and he then denied they had

---

[7] Exhibit 11 is a transcript of Dr. Harbison's video deposition, which was played at trial. I will cite to the page numbers printed on the bottom of each page of the exhibit.

"any bearing to the medical issues." Id. at 13. He disregarded Aviles' subjective complaints of pain. Id. at 7; see also id. at 10 ("I question the amount of pain he actually had from his hernia."). He faulted Aviles for "never even bother[ing] to follow-up with his hernia," incorrectly believing Aviles "just never scheduled surgery" after Dr. Villarreal's 2008 recommendation. Id. at 7, 9. And he assumed Aviles' hernias were always reducible, apparently questioning Dr. Villarreal's findings to the contrary because he believed Dr. Villarreal's operative notes did not use the term "incarcerated" in as many places as they should have. Id. at 14-15.

    49. Accordingly, Dr. Harbison's opinion is entitled to limited weight.

II.    Conclusions of Law

    1. "The [FTCA] provides much-needed relief to those suffering injury from the negligence of government employees." United States v. Muniz, 374 U.S. 150, 165 (1963).

    2. The parties agree that Aviles' FTCA negligence claim is governed by Pennsylvania substantive law. See 28 U.S.C. § 1346(b); Mass. Bonding & Ins. Co. v. United States, 352 U.S. 128 (1956).

    3. Pennsylvania law requires a plaintiff alleging negligence to prove, by a preponderance of the evidence, the following elements: (a) the defendant owed a duty to the plaintiff; (b) the defendant breached its duty; (c) the defendant's breach caused injury to the plaintiff; and (d) actual damages. See Toney v. Chester Cnty. Hosp., 36 A.3d 83, 95 (Pa. 2011); Hardy v. Clover Leaf Mills, 232 A.2d 755, 757 (Pa. 1967).

    4. The first element is satisfied as a matter of law. Under 18 U.S.C. § 4042(a), the government has a duty to "provide for the safekeeping, care, and subsistence," as well as "the

protection," of "persons charged with or convicted of offenses against the United States." See Jones v. United States, 91 F.3d 623, 624-25 (3d Cir. 1996). It is undisputed that Aviles was charged with, and convicted of, such an offense.

5. The government breached its duty to Aviles during his time at FCI-Schuylkill.[8] Aviles notified the prison medical staff of his hernia upon his arrival, and a month later requested that his previously recommended surgery be scheduled. See Findings of Fact at ¶¶ 18, 22, supra. Thereafter, he complained of discomfort several times and repeatedly requested surgery to repair his hernias. Id. at ¶¶ 23-25, 27, 30-34. Although the surgery he sought was elective, I reject the government's view that it had no obligation to address Aviles' complaints -- or his surgeons' recommendations -- within a reasonable time period, and that it could have chosen never to schedule the procedure, as Dr. Harbison testified. See, e.g., id. at ¶ 47.

6. The following facts establish the government's breach of its duty of care: (a) despite Aviles' complaints and requests for surgery after arriving at FCI-Schuylkill, it took the government nine months to order a surgical consultation, and nearly another year to ensure the consultation took place, id. at ¶¶ 22, 28; (b) after Aviles returned from the consultation with Dr. Villarreal, it took the government another year to review the surgical recommendation and refer it to the URC for consideration, id. at ¶¶

---

[8] I find no breach during Aviles' time at the FDC. While there, he complained about his hernia and was seen by a surgeon. See Findings of Fact at ¶¶ 6-8, supra. Thereafter, prison medical staff explained that a non-urgent procedure like his hernia repair would not be performed until he was moved to a more stable environment, a reasonable policy based on concerns about providing a safer atmosphere for healing and the temporary nature of incarceration at a federal detention center. Id. at ¶ 11. Although Aviles testified he was denied over-the-counter pain medication while at the FDC, there is evidence such medication was available to him for purchase. Id. at ¶ 12. Aviles has not met his burden of proving a breach before he was moved to FCI-Schuylkill.

29, 32; and (c) once Aviles was approved for surgery, it took the government nearly four additional months to schedule it, id. at ¶¶ 33-37.  Such delay is so egregious that I may draw on my "every day experience and knowledge of comprehending the facts presented" to conclude that the government negligently failed in its duty to provide for Aviles' safekeeping, care, and protection.  Wareham v. Jeffes, 564 A.2d 1314, 1321 (Pa. Commw. Ct. 1989); see 18 U.S.C. § 4042(a)(2)-(3).

      7.  I have credited Aviles' testimony that his hernia caused him pain, as well as Dr. Villarreal's records noting Aviles suffered discomfort as a result of his hernia.  See Findings of Fact at ¶¶ 36, 40, supra.  It is undisputed that Aviles' surgery was successful, and that he no longer experiences the symptoms he suffered as a result of the two hernias that were removed.  See note 1, supra.  Accordingly, Aviles has established the government's breach caused him injury.

      8.  Finally, Aviles has demonstrated actual damages.  Although not "constant" or "excruciating," as he claimed in administrative complaints, Aviles experienced recurring physical pain.  See Findings of Fact at ¶¶ 23-24, 30-31, 36, supra.  I also find Aviles suffered humiliation when he had to manage his pain and reduce his hernias in the presence of other inmates.  See id. at 20.

      9.  Although the government is liable for its negligence, Aviles was also negligent in continuing to engage in strenuous physical activities in 2007 and 2008, despite his condition, and despite at least one doctor's recommendation that he avoid such activity.  See id. at ¶¶ 18, 20.

      10.  Aviles' negligence justifies reducing the amount of damages to which he is entitled, but does not bar his recovery altogether.  See 42 Pa. Cons. Stat. Ann. § 7102(a).

11.  Accordingly, I will enter judgment in favor of Aviles, and against the government, in the amount of $32,500, which represents $10,000 per year, for the period beginning when Aviles was moved to FCI-Schuylkill and ending when his surgery was performed.

An appropriate order follows.